Kristen L. VICTORY, Plaintiff,

v.

HEWLETT–PACKARD COMPANY,
Defendant.

No. 95–CV–3174 (JS).

United States District Court,
E.D. New York.

Jan. 21, 1999.

Katherine Levitan, Levitan & Pardes, Mineola, NY, for plaintiff.

Thomas J. Flaherty, Elizabeth A. Lalik, Hunton & Williams, McLean, Virginia, Michael D. Tryon, Westermann & Tryon, Garden City, NY, for defendant.

## MEMORANDUM AND ORDER

SEYBERT, District Judge.

Plaintiff, Kristen L. Victory, commenced this action seeking monetary damages and equitable relief against her former employer, Defendant, Hewlett–Packard Company ("HP"), under Title VII of the Civil Rights Law of 1964, 42 U.S.C. § 2000e, *et seq.*, and under New York State Human Rights Law, Executive Law § 290, *et seq.*

Plaintiff alleges, *inter alia*, claims of gender discrimination in the terms and conditions of her employment, through HP's promotion and salary policies and practices which caused a disparate impact toward female employees in general, and a disparate treatment toward Plaintiff in particular. Furthermore, Plaintiff avers that certain of Defendant's practices and procedures created a discriminatory work environment for women which effectively caused Plaintiff's constructive discharge.

Defendant, after the completion of discovery, now moves for summary judgment under Federal Rules of Civil Procedure, Rule 56(c), based primarily on the ground that Plaintiff has failed to demonstrate any promotional opportunity that she was qualified for, or entitled to receive. Moreover, Defendant argues that Plaintiff has failed to proffer evidence, expert or otherwise, to establish a prima facie case of salary discrimination or discriminatory work environment. Finally, Defendant asserts that Plaintiff's voluntary resignation cannot qualify as a constructive discharge because there were no aggravating factors to support such a conclusion.

## FACTUAL BACKGROUND

Plaintiff began her employment with HP as a staff engineer trainee on July 1, 1983, and she became a sales representative on May 1, 1984. Ms. Victory subsequently specialized in data communications until the fall of 1987 when she secured a position as a sales representative in the dealer computer sales force, for HP's fiscal year 1988. Approximately ten months after Plaintiff joined the dealer sales force there was a reorganization. As a result of that reorganization, James Kucharczyk was promoted to District Sales Manager, becoming Plaintiff's manager in the process. (Def.'s Ex. 2D; Def. & Pl. Statement of Undisputed Material Facts (hereinafter "56.1") ¶¶ 1–15.)

Plaintiff's claim essentially asserts that Defendant paid her less than comparably trained and qualified men, failed to promote her to management positions for which she was qualified, and failed to equalize the terms and conditions of her employment. This discrimination was purportedly effectuated by Defendant's unfair system of ranking employees, its failure to publish management positions and its failure to employ objective standards for the selection and promotion of employees to management positions.

After ending her employment with HP, effective May 31, 1990, Plaintiff filed a complaint alleging discrimination with the New York State Human Rights Division ("NYSHRD") on June 6, 1990, and with the Equal Employment Opportunity Commission ("EEOC") on June 18, 1990. On September 28, 1994, the NYSHRD issued a determination of probable cause and dismissed the complaint on the grounds of administrative convenience. On May 16, 1995, the EEOC issued a Notice of Right to Sue letter. (Compl. ¶¶ 3–4, Pl.'s Ex. A: "Determination After Investigation"; 56.1 ¶ 28.)

Since in or about 1986, Plaintiff expressed her interest in obtaining a management position and informed her various district managers of her desire, though she never formally expressed this aspiration in writing. She consistently received "good"r "very good" ratings on her performance evaluations, but higher ratings were needed in order to be considered for management positions.

There were six categories of performance: (1) exceptional; (2) excellent; (3) very good; (4) good; (5) acceptable; and (6) unacceptable. (Def.'s Ex. 2C, 2D, 2E & 2F.) Performance evaluations were prepared by District Managers and reviewed by Area Sales Managers. The performance evaluations effectively created a rank order system, with only a limited number of persons qualifying for management positions within the curve or performance band. A sales representative's ranking was based on a number of factors including quota performance. Quota performance was the least subjective factor and one of the most important factors in the evaluation. (Pl's Dep. Volume II at 10, 18.; Pl.'s Dep. Volume I at 15–19; Tony DiCairano Dep. at 30; Robert A. Gumport, Jr. Dep. at 23–27.) Other criteria evaluated were product knowledge, market knowledge, planning and organization and customer support and satisfaction. (Kucharczyk Dep. at 28–29; Gumport Dep. at 87–88, 93–94).

A comparison of Plaintiff's quota performance and her performance evaluations with those of her male colleagues, for the fiscal years 1986, 1987, 1988 and 1989, demonstrates that Ms. Victory consistently met her quota and exceeded the performance of her male counterparts for all but 1987. In 1987, Plaintiff achieved 60 percent of her quota, however, it reflected a 10 percent increase over her fiscal year 1986 sales results. (Pl.'s Ex. C–10.) Plaintiff was considered a hard worker, and she got along well with her customers. (Frank E. Lebert Dep. at 16; Pl.'s Dep. Volume I at 207–08.)

Salaries were determined by an employee's rank, i.e., a rank at the top of the performance band would entitle the employee to a higher salary. (Gumport Dep. at 30; Kucharczyk Dep. at 73–75.) Sales representatives' salaries included base pay and commissions based on actual sales. "Target compensation" was defined as the amount of salary and commissions that a sales representative would earn if the representative achieved 100 percent of the annual quota. (56.1 ¶ 38.)

Plaintiff requested a transfer to the computer sales force to "become more well rounded, more well suited for a management

position" and her manager DiCairano granted that transfer. (Pl's Dep. Volume I at 69.) Ms. Victory expressed her interest in attaining a management position with her Area Sales Manager, Robert A. Gumport, Jr., and with Personnel Manager, Ronald Moore. There was, however, no specific management position of which she was notified and therefore there was no management position that she was denied. (Pl.'s Dep. Volume II at 15–19.) However, when asked the specific question at deposition: "So are there any specific promotions that you believe you were denied promotion into?" Plaintiff answered "No." (Pl.'s Dep. Volume II at 15.)

HP did not have a uniform practice of posting openings for management positions or a standardized written application procedure. (Pl.'s Dep. Volume II at 15–19; Ronald Moore Dep. at 56–57.) District managers informed their sales representatives of any openings. (Pl.'s Dep. Volume II at 15; Frank E. Lebert Dep. at 8; Eileen Meehan Dep. at 16–17.) Ronald Moore, Defendant's personnel manager for the New York area, was not aware if written standards for advancement to management positions existed. (Ronald Moore Dep. at 56.)

Prior to her maternity leave, which lasted from June 1989 through August 1989, Plaintiff was responsible for two accounts, Word Pro and Manchester. The Manchester account was Defendant's largest customer in the sales district. Plaintiff's quota for fiscal year 1990, as well as the quotas of the other sales representatives was increased on November 1, 1989. Ms. Victory contends that her quota was raised proportionately higher than any of the other sales representatives. (56.1 ¶ 19.) When her maternity leave ended in August 1989, Plaintiff discussed splitting the Manchester account between two sales representatives, while maintaining her base salary and splitting commissions over quota on an equal basis. While Plaintiff discussed this proposal with Kucharczyk, she did not discuss it with Mr. Gumport, the Area Sales Manager, because, according to office practice, the proposal had to be presented to the district manager first. (56.1 ¶¶ 21–22; Pl.'s Dep. Volume I at 110.)

Although, Ms. Victory maintains that she did complain to Gumport and Kucharczyk that her compensation was insufficient for fiscal year 1990, Plaintiff admits that she signed and returned a letter to the personnel department acknowledging her salary level. Plaintiff purportedly told Kucharczyk that she should have gotten more that a 8 to 9 percent raise in view of her past performance and her additional workload. (Pl.Aff. at 2; James Kucharczyk Dep. at 127.)

The performance evaluation Kucharczyk prepared for Plaintiff in April 1990 had an overall rating of "Very Good," but it contained several areas in which "needs attention" was indicated, and certain unfavorable comments were stated. For example, in the "Planning and Organization" category, Kucharczyk noted: "You need to spend more time in front of your customers. Your involvement in the administrative aspects of managing your account appears to be preventing you from making more than one or two calls a week. In an account the size of Manchester, with over 50 sales people, you need to spend at least three days a week in the account or on joint sales calls with their SRs." In summary, Kucharczyk wrote: "You need to improve your performance in several areas, ... primarily by exercising better judgment, by working to see the broader perspective on business issues, and by demonstrating more interpersonal flexibility with your internal and external customers." These general comments are in contrast to the previous paragraph in which Plaintiff is specifically credited with doubling Manchester's business while bringing it to a 16 million dollar level, establishing HP as Manchester's number one vendor, offering a score of products and services to Manchester and assisting in the training of three staff persons at HP.

In response to this evaluation, Plaintiff wrote a detailed, logical and rational analysis of her performance and raised a number of valid issues concerning Kucharczyk's criticisms and Kucharczyk's failure to discuss any problems prior to the evaluation's completion. (Def.'s Ex. 1–I.) Plaintiff expressed her belief that she should have received an "Ex-

cellent" rating because she consistently exceeded her assigned goals and quotas.

Plaintiff complained to Gumport about Kucharczyk's negative authoritarian management style. (Pl.'s Memo to Gumport, Def.'s Ex. 2–J.) While Ms. Victory never used the term "sexual discrimination," she did tell Ronald Moore, the personnel manager, that she felt Kucharczyk discriminated against her, and Moore admitted that HP "is still a white male dominated company." (Pl.'s Dep. Volume I at 126, 139, 222, as recorded in Pl.'s contemporaneous notes; 56.1 ¶¶ 23–27.) Thus, although in meetings with both Gumport and Moore, Plaintiff never expressly and specifically stated that she was discriminated against because of her sex, she certainly conveyed her perceptions toward that end. (56.1 ¶¶ 26–27.) Additionally, Moore apparently told Plaintiff that Kucharczyk's evaluation could be viewed as sexist because it only found fault with her performance in subjective areas. (Pl.'s Dep. Volume I at 224.) For example, Plaintiff complained that Kucharczyk required her to keep a call sheet, a condition no other sales representative with her experience was subjected to, and Kucharczyk acknowledged as much. (Kucharczyk Dep. at 76.) In addition, Moore, using different words, supposedly stated that Gumport and Kucharczyk had spoken previously with Moore, about Victory and her performance evaluation, to cover themselves and their story. (Pl.'s Dep. Volume I at 223.)

In her memo to Gumport, dated April 4, 1990, Plaintiff requested a transfer, specifically complaining that Kucharczyk demonstrated a lack of negotiating skills with her customers and has "create[d] a dealer who feels that he should get a kickback for every order that Jim (Kucharczyk) wants to place, so that he (Kucharczyk) will make his quota." However, Gumport testified that Plaintiff only complained about her evaluation and never mentioned the alleged kickback scheme. (Gumport Dep. at 74–77.) Although a substantial portion of Plaintiff's efforts have been directed at the alleged kickback scheme, as will be discussed infra, it is not relevant to her claim, and therefore does not necessitate extended discussion herein.

## STATISTICAL ANALYSIS

Plaintiff's claim of disparate impact discrimination is based primarily on the comparative statistical evidence. Plaintiff's expert, Jonathan Falk, is a Senior Consultant at National Economic Research Associates, and based upon data supplied during discovery by Defendant, Falk determined that during the years 1986 through 1989, 12 male sales representatives were promoted, yet no women were promoted. Although 83 men were not promoted, all 25 female sales representatives were not promoted. This analysis resulted in a finding that there was only a one in twenty chance that this outcome could have occurred randomly, and therefore, Falk concluded that "while differential rates of performance ratings partially explain this result, there is no explanation for the fact that women received lower promotion rating than men." (Def.'s Ex. 2L, Falk's Report.) Further, a review of the salaries of women showed that "women received significantly lower salaries than men." *Id.* "The statistical implication is that HP has systematically discriminated against women in promotion and pay for sales representatives." *Id.*

The pool of possible candidates for promotion included sales representatives in the New York area and included all promotions during the 1986 to 1989 period. Falk does not recognize a standard benchmark level for determining statistical probability but employed "Fisher's Exact Test" to determine statistical probability. (Falk Dep. at 73–74.)

All the men who were promoted received an exceptional rating, yet of the 25 women in the pool, only 4 women received an exceptional rating, none of whom were promoted, and therefore, Falk concluded, the Defendant's failure to promote cannot be based upon the relative performance of the women. Generally, women were less likely than men to receive the highest rank, i.e., extraordinary or excellent, but that circumstance should have only affected their salary and not promotional opportunities. (Def.Ex 2L.) As far as salary was concerned, Falk's analysis disclosed that women received around $7,500 per year less than men, and even after differentiating for job group and performance rating differences, there was still a

$5,900 per year gap between the salaries of men and women. (Def.Ex.2L.) Falk used the actual compensation rather than target compensation to measure salary disparity. (Falk Dep. 89–91.)

Defendant's expert, Dr. Elizabeth Becker, attacks Falk's analysis because Falk failed to meet the benchmark level of statistical significance which is 0.05. Becker criticizes Falk's inclusion of an employee who geographically was outside the New York area, another employee who was granted a lateral transfer but not a promotion, and the inclusion of employees who were not eligible for promotion to management. Plaintiff's expert's response is that he was supplied the data from Defendant and his methods are appropriate and scientifically sound, even when compared to Dr. Becker's results. (Falk Dep. 91, 94, 101, 134.)

## DISCUSSION

### I STANDARDS FOR GRANTING SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(c), courts may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden of proof is on the moving party to show that there is no genuine issue of material fact, *Gallo v. Prudential Residential Services*, 22 F.3d 1219, 1223 (2d Cir.1994) (citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975)), and "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987)) "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citing 10A Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2725, at 93–95 (1983)).

A party opposing a motion for summary judgment " 'may not rest upon the mere allegations or denials of his pleading, but … must set forth specific facts showing that there is a genuine issue for trial.' " *Id.*, 477 U.S. at 248, 106 S.Ct. at 2510 (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). Under the law of the Second Circuit, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224 (citing *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988)).

With respect to private employment discrimination claims, the three-tier burden shifting analysis first set forth in *McDonnell Douglas* is utilized. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). In this failure to promote claim based on gender discrimination, Plaintiff's initial burden is to establish a prima facie case which consists of the following four elements: (1) she is a member of a protected group; (2) she applied for and was qualified for the position in question; (3) she did not receive the position; and (4) either the position remained open or it was filled by someone not a member of her protected class. *See, de la Cruz v. New York City Human Resources Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 20 (2d Cir.1996); *Sweeney v. Research Found. of State Univ. of New York*, 711 F.2d 1179, 1185 (2d Cir.1983); *Samuels v. New York State Dep't of Correctional Servs.*, No. 94 Civ. 8645, 1997 WL 253209, at *5 (S.D.N.Y. May 14, 1997); *Chojar v. Levitt*, 773 F.Supp. 645, 652 (S.D.N.Y. 1991).

The next two tiers are described in *Fisher v. Vassar College*, 114 F.3d 1332 (2d Cir. 1997), and its predecessor opinion before rehearing en banc reported at *Fisher v. Vassar College*, 70 F.3d 1420 (2d Cir.1995), which quote from the applicable Supreme Court pronouncements as follows: "If the plaintiff presents a prima facie case, the burden shifts to the employer, who is required to demon-

strate 'some legitimate, nondiscriminatory reason' for the decision." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. "The employer's burden here is one of production of evidence rather than one of persuasion." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The defendant need only articulate, not prove, the existence of a nondiscriminatory reason. *Id.* at 254–56, 101 S.Ct. at 1094–95. If the defendant carries this burden of production, the plaintiff then assumes the burden to "show that [the employer's] stated reason for [the plaintiff's] rejection was in fact pretext." *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825. However, it is not enough for a plaintiff to show that the defendant's legitimate, nondiscriminatory reason for its employment decision is pretextual; the plaintiff must also prove by a preponderance of the evidence that defendant's stated reason is "a pretext for discrimination." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993).

Pretext may be directly proven by showing that discrimination was a motivating factor in the decision to terminate, *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir.1995), or indirectly by introducing evidence which shows that the defendant's proffered reason is unworthy of credence. *Hicks,* 509 U.S. at 511, 113 S.Ct. at 2749; *Binder v. Long Island Lighting Co.,* 57 F.3d 193, 199–200 (2d Cir.1995).

In addition, proof utilized to establish the prima facie case may be used to show that defendant's non-discriminatory explanation was pretextual and to raise the necessary inference of discrimination. *See, e.g., DeMarco v. Holy Cross High School,* 4 F.3d 166, 170 (2d Cir.1993) (proof that the employer has provided a false reason for its action permits the finder of fact to determine that the defendant's actions were motivated by an improper discriminatory intent, but does not compel such a finding).

The burden-shifting framework does not alter the fact that the plaintiff at all times bears the burden of persuading the trier of fact that the defendant unlawfully discriminated against him. *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995). A showing that the adverse employment action occurred under circumstances giving rise to an inference of gender discrimination may be proven by either direct, statistical or circumstantial evidence. *See Taggart v. Time, Inc.,* 924 F.2d 43, 46 (2d Cir.1991). Plaintiff ultimately must show that discrimination "played a motivating role in, or contributed to, the employer's decision." *Renz v. Grey Advertising, Inc.,* 135 F.3d 217, 222 (2d Cir.1997). Thus, "[t]he question becomes the same question asked in any other civil case: Has the plaintiff shown, by a preponderance of the evidence, that the defendant is liable for the alleged conduct?" Fisher, 114 F.3d at 1336.

In discrimination cases at the prima facie stage, however, a plaintiff's burden of proof is de minimis. *See, e.g., Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 51 (2d Cir.1998). Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment. *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996).

Although Title VII cases often turn on the issue of an employer's intent or state of mind, such cases may be resolved on summary judgment where appropriate. *Dister,* 859 F.2d at 1114. This is so because the "salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). Otherwise "[t]he summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Id.*

The Court is mindful that the evidence must be looked at in its entirety, rather than piecemeal, in deciding a motion for summary judgment. *See Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 314 (2d Cir.1997). It is within this framework that the Court addresses the present summary judgment motion.

## II  EMPLOYMENT DISCRIMINATION

■ There are various theories upon which a claim of employment discrimination may be advanced, including pretext, mixed motive and a pattern or practice of discrimination. Discrimination can be demonstrated through evidence of either "disparate treatment" or "disparate impact." To show "disparate treatment," the plaintiff is "required to prove that the defendant had a discriminatory intent or motive." *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 986, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988). Discriminatory motive can be proved by direct or circumstantial evidence, though most often a Title VII plaintiff "is usually constrained to rely on the cumulative weight of circumstantial evidence." *Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir.1991).

■ "Disparate impact," on the other hand, is based upon the premise "that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination," *Watson,* 487 U.S. at 987, 108 S.Ct. at 2785, because the result "fall[s] more harshly on one group than another and cannot be justified by business necessity." *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). The evidence in "disparate impact" cases "usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities." *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1041 (2d Cir.1993) (dismissing plaintiff's complaint because the statistics demonstrated that all similarly situated males and females, except for the plaintiff, received comparable salary increases and promotions) (citing *Watson,* 487 U.S. at 986, 108 S.Ct. at 2784). Because the proof requirements and the relief available for disparate impact and disparate treatment causes of action differ, these claims must be analyzed separately. However, to avoid repetition of facts, the disparate treatment analysis in Section II includes, where appropriate, reference to disparate impact claims, which are treated separately in Section V.

## III  DID PLAINTIFF ESTABLISH A VALID CLAIM OF DISPARATE TREATMENT UNDER THE PRETEXT THEORY OF DISCRIMINATION FOR HP'S FAILURE TO PROMOTE PLAINTIFF

### A.  PRIMA FACIE CASE

■ During the pendency of this motion, the Second Circuit Court of Appeals rendered a decision on December 16, 1998, in *Brown v. Coach Stores, Inc.,* 163 F.3d 706, 708, 1998 WL 888979 (2d Cir.1998) and this Court heard oral argument on January 15, 1999, on the instant motion, in light of the *Brown* decision.

In *Brown,* the Second Circuit affirmed the district court's dismissal of plaintiff's failure to promote claim pursuant to Federal Rule of Civil Procedure 12(b)(6). In so affirming, the Second Circuit analyzed binding Supreme Court precedent to "require a plaintiff to allege that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion." *Id.* 163 F.3d at 709–10, 1998 WL 888979. This requirement was necessary because "if generally requesting a promotion in an annual review were sufficient to establish a prima facie case, employers would be unfairly burdened in their promotion efforts." *Id.* The court specifically rejected an assertion that the job opportunities were infrequently posted, or that the aura of discrimination discouraged continued requests for promotion. *Id.* Although the court left open the possibility of a valid failure to promote claim arising in the situation where the employer "refused to accept applications for positions or hand-picked individuals for promotion to a position without considering applicants," the general rule requires a candidate to make application for a specific position. *Id.* 163 F.3d at 710–11, 1998 WL 888979.

It is against this backdrop that Plaintiff's failure to promote claim must be analyzed. As a female, Plaintiff is a member of a protected group. Defendant asserts that Plaintiff cannot establish a prima facie case of discrimination on separate grounds. First, Defendant asserts that Plaintiff's claim fails because Plaintiff never applied for a job

for which HP was seeking applicants. Although Plaintiff expressed her interest in obtaining a management position with her district managers, it is undisputed that Plaintiff never applied for a specific position. While Hewlett–Packard did not have a uniform practice of posting openings for management positions or a standardized written application procedure, district managers informed their sales representatives of openings. In addition, there was a performance evaluation procedure which incorporated some objective standards, and these evaluations were utilized to assess a potential promotional candidate's qualifications.

Generally, Plaintiff was extremely productive at increasing sales production, but her evaluations contained areas in which "needs attention" was indicated such as "planning and organization." (Def.'s Exs. 2C, 2D, 2E & 2F.) These areas may have introduced elements of subjectivity into the evaluation procedure, however, the evaluations were not a pretense for discrimination in the promotional practice. The performance evaluations effectively created a rank order system, with only a limited number of persons qualifying for management positions within the curve or performance band. Moreover, and critical to this determination, Plaintiff acknowledged that she was not aware of any promotions that occurred during the relevant time period in which she felt that she was better qualified than the individual promoted.

Defendant also avers that Plaintiff cannot show that she was rejected from any position despite her qualifications, nor that after her rejection HP continued to seek specific applicants with her qualifications, rather HP maintains that Plaintiff was granted every transfer she requested. It is uncontroverted that Plaintiff failed to articulate a specific promotion for which she was denied, and there is caselaw supporting the proposition that absent an opening which has arisen during the time period in question, a claim for failure to promote will not lie. *See Hudson v. International Business Machines Corp.*, 620 F.2d 351, 354 (2d Cir.1980) (affirming dismissal of Title VII failure to promote claim where plaintiff "offered no proof ... that any particular position ... was even available during that period"); *Davis v. Bowes*, No. 95 Civ. 4765, 1997 WL 655935, at

*9 (S.D.N.Y. Oct.20, 1997) (plaintiff's "inability to raise an issue of fact as to whether any vacancy has arisen since [her employer] informed her of th[e] prerequisites to her [request for] transfer is fatal to th[e] claim").

In addition, although Plaintiff placed great emphasis on the alleged kickback scheme employed by her supervisor Kucharczyk, she has failed to evince the required nexus to her discrimination claim. There has been no evidence proffered to show that only women were required to participate in this scheme. Further, if Kucharczyk only required Plaintiff to participate because of a personal animus, this does not advance Plaintiff's claim. The evidence of discrimination must be specifically related to the alleged claim. *See DeCintio v. Westchester County Med. Ctr.*, 807 F.2d 304, 308 (2d Cir.1986) (employer's conduct in creating job that could be filled only by his female lover though "unfair, simply did not violate Title VII"); *Arroyo v. New York State Ins. Dep't*, No. 91 Civ 4200, 1995 WL 611326, at *5 (S.D.N.Y.1995) (finding that although supervisors harassed plaintiff through vandalism, undue monitoring, unreasonable searches and other forms of harassment, it was not motivated by age bias and therefore plaintiff failed to establish a prima facie case); *Donaldson v. Merrill Lynch & Co., Inc.*, 794 F.Supp. 498, 508 (S.D.N.Y.1992) (assertions of failing to follow procedures for termination and falsely informing plaintiff of reason for termination do not establish pretext if not specifically related to sexual discrimination).

Accordingly, based on the Second Circuit's recent unequivocal pronouncement in *Brown*, and Plaintiff's failure to specify a particular promotional position for which she applied, and absent the type of extenuating circumstances that would render this requirement quixotic, Plaintiff Kristen L. Victory has failed to establish a required prima facie element of her claim.

## IV DID PLAINTIFF ESTABLISH A VALID CLAIM OF DISPARATE TREATMENT UNDER THE MIXED MOTIVE THEORY OF DISCRIMINATION FOR HP'S FAILURE TO PROMOTE PLAINTIFF

Having failed to establish a prima facie case of disparate treatment under the

pretext theory, Plaintiff's complaint, if read to allege a mixed motive theory of discrimination must also fail. Under the mixed motive theory of employment discrimination, a plaintiff "must initially show more than the 'not onerous' McDonnell Douglas–Burdine factors." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir.1992). "[T]he plaintiff must initially show that an impermissible criterion was in fact a 'motivating' or 'substantial' factor in the employment decision." *Raskin v. Wyatt Co.*, 125 F.3d 55, 60 (2d Cir.1997). Such a showing could be made through the use of, for example, "nonstatistical evidence ... directly tied to the forbidden animus." such as "policy documents or statements of a person involved in the decisionmaking process that reflect a discriminatory or retaliatory animus ..." *Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir.1992). This burden has been described as requiring the plaintiff to "produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment." *Raskin*, 125 F.3d at 61 (citing *Fields v. New York State Office of Mental Retardation and Developmental Disabilities*, 115 F.3d 116, 124 (2d Cir.1997)).

■ However, a plaintiff would not be entitled to a mixed motive burden shifting instruction based on (1) purely statistical evidence; (2) mere evidence of the plaintiff's qualification for, and the existence of, a certain position; or (3) "stray" remarks in the workplace by persons not involved in the relevant decisionmaking process. *Ostrowski*, 968 F.2d at 182.

■ Once the plaintiff has made the threshold showing, only then does "the burden shift to the employer to prove that it would have made the same decision absent the discriminatory factor." *Raskin*, 125 F.3d at 60.

Here, the Plaintiff's case is devoid of a "smoking gun" of forbidden animus, and is reliant upon the type of proof specifically delineated as insufficient to support a mixed motive claim. Accordingly, having failed to establish the necessary elements of a prima facie case, Plaintiff's case will not proceed under a mixed motive theory of recovery.

## V DID PLAINTIFF ESTABLISH A VALID CLAIM OF DISPARATE TREATMENT UNDER THE PATTERN OR PRACTICE THEORY OF DISCRIMINATION FOR HP'S FAILURE TO PROMOTE

■■ A pattern or practice claim is a method of proving disparate treatment discrimination. *See Wessmann v. Gittens*, 160 F.3d 790, 817 n. 20 (1st Cir.1998) (Lipez, J. dissenting) ("In every instance in which the phrase has been used by the Supreme Court, a 'pattern or practice' claim under Title VII refers to a pattern or practice of disparate treatment, rather than disparate impact.") (citing Maurice E.R. Munroe, *The EEOC: Pattern and Practice Imperfect*, 13 Yale L. & Pol'y Rev. 219, 227 n. 48 (1995) ("on a strict statutory construction, 'pattern or practice' discrimination refers only to disparate treatment discrimination")).

■ To establish a pattern or practice of discrimination, a plaintiff must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *Teamsters*, 431 U.S. at 336, 97 S.Ct. at 1855; *see also Cooper v. Federal Reserve Bank*, 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984). Rather, a plaintiff must "establish by a preponderance of the evidence that ... discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Teamsters*, 431 U.S. at 336, 97 S.Ct. at 1855. At that point, the burden shifts to the employer to demonstrate that the plaintiff's proof is "either inaccurate or insignificant." *Id.* at 360, 97 S.Ct. at 1867. The employer's failure to carry this burden creates a presumption of discrimination. *Id.* at 362, 97 S.Ct. at 1868. "The proof of the pattern or practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy." *Id.* The employer then carries the burden to demonstrate that the individual employment decision was made for lawful reasons. *See id.*

The Second Circuit's pronouncement in *Brown* is equally instructive and germane on the issue of Plaintiff's pattern and practice

claim herein. The court held that Supreme Court precedent required an initial finding of a history of discrimination by the employer to the class of plaintiffs, and that the language in *Teamsters* suggesting that a plaintiff need not have actually applied for a particular position to assert a valid claim, 431 U.S. at 365, 97 S.Ct. 1843, is inapposite in individual suits. *Brown*, 163 F.3d 706, 710–11, 1998 WL 888979, at *4.

Other courts have called into question whether a pattern or practice claim can be established outside of a class action suit, or where, at least, numerous plaintiffs are joined in the action. *See, e.g., Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 759 (4th Cir.1998) ("individuals do not have a private, non-class cause of action under § 1981 or Title VII"); *Gilty v. Village of Oak Park*, 919 F.2d 1247, 1252 (7th Cir.1990) (pattern and practice evidence is only collateral to evidence of specific discrimination against individual plaintiffs); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 866 n. 6 (7th Cir.1985) (finding pattern and practice argument misplaced in nonclass suits); *In re Western Dist. Xerox Litig.*, 850 F.Supp. 1079, 1083 (W.D.N.Y.1994) ("Trials of that discrete [pattern and practice] issue generally occur in the context of class actions or suits brought by the Government which follow the Teamster's paradigm.").

The Court concurs with this limiting analysis, which is borne out by Title VII's legislative history addressing the meaning of pattern or practice, as cited in *Teamsters*, quoting Senator Humphrey, who explained:

> A pattern or practice would be present only where the denial of rights consists of something more than an isolated, sporadic incident, but is repeated, routine, or of a generalized nature. There would be a pattern or practice if, for example, a number of companies or persons in the same industry or line of business discriminated, if a chain of motels or restaurants practiced racial discrimination throughout all or a significant part of its system, or if a company repeatedly and regularly engaged in acts prohibited by the statute. . . . The point is that single, insignificant, isolated acts of discrimination by a single business would not justify a finding of a pattern or practice. . . .

431 U.S. at 337 n. 16, 97 S.Ct. at 1855 n. 16 (quoting 110 Cong. Rec. 14270 (1964)).

In the case at bar, the statistical evidence was purposefully restricted to the New York area and not HP's national operation, and the facts do not support such a universal claim. Accordingly, Plaintiff's case will not proceed under a pattern or practice theory of discrimination.

For all the aforementioned reasons, Plaintiff's claim of disparate treatment and failure to promote must fail.

## VI DID PLAINTIFF ESTABLISH A VALID DISPARATE IMPACT CLAIM OF DISCRIMINATION

The Civil Rights Act of 1991 was specifically enacted, in part, to negate select Supreme Court decisions affecting Title VII interpretation. In doing so, the disparate impact analysis was codified at 42 U.S.C. 2000e–2(k).[1]

---

1. The statute provides in relevant part:

(k) Burden of proof in disparate impact cases (1)(A) An unlawful employment practice based on disparate impact is established under this subchapter only if—
(i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or
(ii) the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.
(B)(i) With respect to demonstrating that a particular employment practice causes a disparate impact as described in subparagraph (A)(i), the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice.
(ii) If the respondent demonstrates that a specific employment practice does not cause the disparate impact, the respondent shall not be required

"To establish a prima facie case of disparate impact, a plaintiff must show that a facially neutral employment policy or practice has a significant disparate impact." *Brown*, 163 F.3d 706, 712–13, 1998 WL 888979 (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 430–32, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)). Plaintiff is required to first identify the specific employment practice she is challenging and then show that the practice excluded her, as a member of a protected group, from a job or promotion opportunity. *See Watson*, 487 U.S. at 994, 108 S.Ct. at 2788. Statistical disparities that are sufficiently substantial may raise an inference of causation. *See id.* at 995, 108 S.Ct. at 2789; *see also Bridgeport Guardians, Inc. v. City of Bridgeport*, 933 F.2d 1140, 1146 (2d Cir. 1991). Thus, a prima facie case can be established by the showing of "either a gross statistical disparity, or a statistically significant adverse impact coupled with other evidence of discrimination." *Waisome v. Port Authority of New York and New Jersey*, 948 F.2d 1370, 1375 (2d Cir.1991).

In response, the statute requires the employer to demonstrate that the subject employment practice is job related for the position in question and consistent with business necessity, however, if it can be shown that the practice in question does not cause the disparate impact, business necessity becomes immaterial. The burden then shifts back to the plaintiff to show that there are alternative employment practices that will reduce the disparate impact, yet achieve the employer's goal, that is to say that the employer's reason was a pretext for discrimination. *See Wards Cove*, 490 U.S. at 660–61, 109 S.Ct. at 2126–27.

### 1. Performance Evaluations

With respect to the performance evaluations, the starting point for review is the oft-quoted passage, "[a]n employer may not use wholly subjective and unarticulated standards to judge employee performance for the purposes of promotion," yet "courts must refrain from intruding into an employer's policy apparatus or second-guessing a business's decision-making process ..." *See Grant v. Morgan Guar. Trust Co. of New York*, 638 F.Supp. 1528, 1537 (S.D.N.Y.1986) (citing *Knight v. Nassau County Civil Serv. Comm'n*, 649 F.2d 157, 161 (2d Cir.1981) and *Meiri*, 759 F.2d at 995.)

While this Court is not disposed to second-guess an employer's policy apparatus or decision making process, it cannot disregard the disparity between the specific objective standards in which Plaintiff received high grades and praise, and the more subjective standards in which Plaintiff is criticized by Kucharczyk. Thus HP's standards encompassed productivity by utilizing a quota to rate sales representatives, yet the crucial excellent rating was not based solely on productivity, but also weighed other subjective factors.

In Ms. Victory's situation, a disparate impact might be found to exist if the criteria for awarding an excellent or extraordinary rating was so subjective that predominately only males received these elevated grades, so critical to promotion. This type of de facto circumstance goes far to establish that although Defendant's evaluation criterion was facially neutral, when utilized for promotional purposes it resulted in a disparate impact toward female employees.

### 2. Statistical Showing

The statistical information strongly supports Plaintiff's disparate impact claim. In fact, "statistical proof can alone make out a prima facie case" of disparate impact. *Wards Cove*, 490 U.S. at 650, 109 S.Ct. at 2121; *see also Teamsters*, 431 U.S. at 339–40 n. 20, 97 S.Ct. at 1856–57; *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d

to demonstrate that such practice is required by business necessity.
(C) The demonstration referred to by subparagraph (A)(ii) shall be in accordance with the law as it existed on June 4, 1989, with respect to the concept of "alternative employment practice".

(2) A demonstration that an employment practice is required by business necessity may not be used as a defense against a claim of intentional discrimination under this subchapter.

158 (1971); *Pollis v. New School for Social Research,* 132 F.3d 115, 123 (2d Cir.1997).

The Supreme Court has repeatedly countenanced the use of statistical evidence, and evidence of the absence of a single minority employee being hired, labeled the "inexorable zero," would in and of itself support an inference of discrimination. *See Teamsters,* 431 U.S. at 342 n. 23, 97 S.Ct. at 1858 n. 23 ("In any event, fine tuning of statistics could not have obscured the glaring absence of minority line drivers.... the company's inability to rebut the inference of discrimination came not from a misuse of statistics, but from the inexorable zero."); *see also NAACP, Inc. v. Town of East Haven,* 70 F.3d 219, 225 (2d Cir.1995) (vacating denial of preliminary injunction enjoining defendant from hiring any town employees in light of failure to ever hire a full-time black employee, which, by itself, supports an inference of discrimination); *EEOC v. O & G Spring and Wire Forms Specialty Co.,* 38 F.3d 872, 878 (7th Cir.1994) (finding of intentional discrimination was supported by statistical showing that defendant failed to hire any African–Americans); *Loyd,* 25 F.3d at 524 n. 4 (where promotional procedure maintained the inexorable zero it is strong evidence of intent to bring about that result); *Babrocky,* 773 F.2d at 867 n. 7 (holding reliance on statistical evidence of inexorable zero was sufficient to establish prima facie case, notwithstanding plaintiff's failure to reference appropriate workpool); *Bethlehem Steel,* 635 F.2d at 1015 (reversing district court's grant of summary judgment for employer, in part, because statistics supported failure to employ minorities as foremen, notwithstanding their lack of prior experience in this position).

Similarly, in the case at bar, HP has failed to refute the troubling fact that nary a single female sales representative has ever been promoted to a managerial position.

■ Under Rule 402 of the Federal Rules of Evidence "[f]or statistics to be valid and helpful in a discrimination case, 'both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination.'" *Simpson v. Midland–Ross Corp.,* 823 F.2d

937, 944 (6th Cir.1987) (quoting *Segar v. Smith,* 738 F.2d 1249, 1274 (D.C.Cir.1984)).

The Court notes that a review of the history of this litigation reveals a disturbing reluctance on the part of HP to provide relevant personnel records during discovery, which may have resulted in limiting the statistical sample available for analysis.

Plaintiff's economic expert, Jonathan Falk, utilized the Fisher Exact Test in analyzing the respective promotions and salaries of male and female HP employees. The statistics analyzed 12 promotional decisions, all of which went to males, made from a pool of 95 men and 25 women, and the conclusion reached was that "the observed pattern is the most extreme pattern adverse to women which could have occurred." (Falk Report, Pl.'s Ex. 2L.) This result would only occur by chance 5 percent of the time. *Id.* Moreover, the report indicated that these results were not fully supported by the performance evaluations because 4 of the 25 women did in fact receive the highest rating at some point in their evaluations.

Defendant's expert, Elizabeth Becker, reviewed and critiqued Falk's report. Becker concluded that neither the salary nor promotional disparity between male and female employees was statistically significant, and further concluded that Falk's methodology was faulty. (Becker Report, Pl.'s Ex. 2M.)

With respect to Falk's conclusions, Becker reports that probability values above 0.05 are statistically insignificant, and the results garnered from Falk's analysis are properly calculated as 0.052, not 0.05 as reported, and therefore, Falk's results cannot be deemed statistically significant. Becker also challenges whether the recorded promotions of some of the males included in Falk's study were in fact promotions, as opposed to lateral transfers, or whether those included in the general pool were in fact in a position to be promoted to management. (Becker Report, Pl.'s Ex. 2M.)

It is also apparent that Falk's report may have been over-inclusive by grouping all the employees who became eligible for promotion during the time period analyzed as potential candidates for each promotion reported,

whether they were in a position to be promoted on that promotional date or not. (*See* Falk Dep. at 83.)

. At summary judgment, however, a court does not meticulously weigh the evidence, rather, it considers whether the admissible evidence raises a genuine issue of material fact. Statisticians may wish to quibble over two-tenths of one percent, and the meaning lying therein, which, at this juncture, this Court views as a distinction without a difference. Resolution of the battle of experts is a matter best suited for the trier of fact. The Court finds the statistical evidence, highlighted by the "exculpatory zero" results, supportive of an inference of gender discrimination and a disparate impact claim.

Plaintiff has identified the promotional practice of Hewlett Packard, as implemented through its performance evaluation procedure, as the employment practice which has prevented female participation in management. Although female employees have sporadically received the highest rating in particular categories, none have been promoted. The complete lack of female participation in management is highly persuasive evidence of a disparate impact claim. *See* Ramona L. Paetzold & Rafael Gely, *Through the Looking Glass: Can Title VII Help Women and Minorities Shatter the Glass Ceiling?* 31 Hous.L.Rev. 1517, 1534–35 (1995) (noting that Title VII's "failure to assist women and minorities adequately in advancement and promotion is due in part [to] persistent stereotypes"). Although many factors may have contributed to this result, a disparate impact claim need not demonstrate an intent to discriminate, rather, the results speak for themselves.

Although such results can be defended, for example in this instance by a showing that the evaluation procedure is job related for the managerial positions in question, and consistent with business necessity, however, Defendant has not endeavored to proffer such defense. Rather, HP argues that Plaintiff's claim is without merit on its face and that the statistical evidence is flawed and not statistically significant.

The Court acknowledges that Plaintiff's statistical expert has provided a report that does not contain the thorough exacting analysis that would wholly establish a foundation for a disparate impact claim, nonetheless, the evidence presented survives summary judgment, albeit by a slim margin.

Because a judge is not a "hierophant of social graces," a jury is better suited to measure dimensions of discrimination disguised in the dynamics of the workplace. *See Gallagher v. Delaney*, 139 F.3d 338, 347 (2d Cir.1998). The Court recognizes that many of Plaintiff's claims are supported by tenuous evidence, however, because every reasonable inference must be drawn in favor of the nonmovant, Kristen Victory, the Court concludes that Plaintiff has sufficiently established the existence of genuine issues of material fact to warrant a trial on her claim of disparate impact.

## VII DID PLAINTIFF ESTABLISH AN EQUAL PAY ACT CLAIM

■ Although Plaintiff did not state a claim specifically citing to the statutory provision of the Equal Pay Act ("EPA"), the complaint does assert that HP (1) failed to pay to plaintiff the same amount in salary paid to comparably trained and qualified men; and (2) paid wages to plaintiff at a rate less than the rate which it pays wages to male employees for equal work in jobs requiring equal skill, effort and responsibilities and which are performed under similar work conditions. (Pl's Compl. ¶ 10(a) & (c).) The Court will not place form over substance, as such, Plaintiff's complaint advances a valid assertion of a claim under the EPA. *See Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 131 (2d Cir.1996) (EPA applies when claim raises sex discrimination under Title VII).

The EPA is part of the Fair Labor Standards Act, and provides, in pertinent part:

No employer having employees subject to any provisions of [§ 6 of the FLSA] shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for

equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex. . . .

29 U.S.C. § 206(d)(1).

To establish a prima facie case under the EPA, a plaintiff has the burden of showing that the employer paid different wages to employees of opposite sexes in the same establishment for equal work on jobs whose performance requires equal skill, effort, and responsibility. *Corning Glass Works v. Brennan,* 417 U.S. 188, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974). A plaintiff need not demonstrate that her job is identical to a higher paid position, only that the two positions are "substantially equal," but, "merely comparable" positions are not relevant to the inquiry. *See Lambert v. Genesee Hosp.,* 10 F.3d 46, 56 (2d Cir.1993). A distinguishing characteristic of the EPA is that "a plaintiff need not prove an employer intended to discriminate against her in order to prevail on her claim." *Tomka,* 66 F.3d at 1310.

Once the plaintiff makes out a prima facie case, the burden of persuasion shifts to the employer to prove that the disparity is justified by one of four statutorily provided affirmative defenses. *Id.*

Victory's proffer of evidence in support of an EPA claim is based on conclusory conjecture. When asked "[w]hat male sales representatives in the New York area who had similar experience and length of service were paid higher wages than you without commission," Victory responded, there were several, however, when asked to specifically name them, she could not, nor was she aware of what they were paid, nor did she have any hard evidence in writing to support these suspicions. (Pl.'s Dep. Volume I, Ex. G. at 38–40.)

Moreover, although Falk's Report included information pertaining to the comparative overall salary structure of male and female employees, it failed to individually analyze Plaintiff's salary vis a vis similarly experienced male colleagues performing like work. Further, because the salary structure is comprised of base pay and targeted commissions, any reference to commissions would be precluded by the EPA's exception for a system which measures earnings by quantity or quality of production. Accordingly, Plaintiff's proof fails to satisfy the rigorous standards of an EPA claim. *See, e.g., Fisher,* 70 F.3d at 1452 (plaintiff's failure to provide sufficient evidence establishing that she performed the equivalent of male colleagues with equal credentials, notwithstanding four salary charts introduced into evidence, compelled the circuit court's reversal precluding her EPA claim). However, Plaintiff will be allowed to present evidence of salary differentiation in support of her disparate impact claim.

## VIII DID PLAINTIFF ESTABLISH A CONSTRUCTIVE DISCHARGE CLAIM

Although never mentioned in Plaintiff's complaint, her Memorandum of Law in Opposition to Summary Judgment alleges a claim of constructive discharge. Defendant would be prejudiced by Plaintiff's initial assertion of this claim at summary judgment, however, because a constructive discharge cause of action is unsupported by the record, as discussed *infra,* the propriety of raising a claim at this late juncture need not be considered.

"To establish a 'constructive discharge,' a plaintiff must show that the employer 'deliberately ma[de his] working conditions so intolerable that [he was] forced into an involuntary resignation.'" *Stetson v. NYNEX Serv. Co.,* 995 F.2d 355, 360 (2d Cir.1993) (quoting *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir. 1983)). Intolerable working conditions have been described as conditions "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Chertkova,* 92 F.3d at 89 (quoting *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d Cir.1987)). A prerequisite

to a finding of constructive discharge is proof that the "employer deliberately created working conditions" effectively forcing the employee to resign. *Kader v. Paper Software, Inc.,* 111 F.3d 337, 341 (2d Cir. 1997).

Constructive discharge requires more than evidence that the "employee was dissatisfied with the nature of his assignments," *Stetson,* 995 F.2d at 360, or that the "employee disagreed with the employer's criticisms of the quality of his work, or did not receive a raise, or preferred not to continue working for that employer. Nor is the test merely whether the employee's working conditions were difficult or unpleasant." *Spence v. Maryland Cas. Co.,* 995 F.2d 1147, 1156 (2d Cir.1993) (citations omitted).

Additionally, the employee's subjective perceptions are not determinative. *See Nobler v. Beth Israel Med. Ctr.,* 702 F.Supp. 1023, 1030 (S.D.N.Y.1988) (and cases cited therein) ("Subjective feelings held by an employee as to the intolerable nature of his or her position are not sufficient to lead to a finding of constructive discharge.").

Not only is it necessary to show intolerable working conditions, but the plaintiff must also allege facts sufficient to prove that these conditions were intentionally created by the employer for the purpose of inducing the employee's resignation or retirement.

Plaintiff submitted a letter of resignation on May 21, 1990, expressing her gratitude and appreciation for "the splendid cooperation and backing I have received, the rich and exciting experiences, and always the wonderful association with so many grand people." (Pl.'s Ex. K.) The Court disregards this letter realizing it was written, in part, to ensure a congenial departure and the prospect of favorable recommendation letters, yet conversely, there has been no evidence provided that could reasonably lead to the conclusion that HP's actions were carried out with the specific intent of inducing Victory's resignation.

Thus, where an employee is not satisfied with the terms and conditions of her employment and makes an affirmative decision to leave, a subsequent charge of constructive discharge will not be upheld absent the employer's intentional imposition of intolerable work conditions, not present herein. As the relevant precedents make clear, the facts before this Court do not embody a constructive discharge. *See, e.g., Ternullo v. Reno,* 8 F.Supp.2d 186, 193 (N.D.N.Y.1998) (granting summary judgment where plaintiff's claims of constructive discharge were predicated on (1) denial of promotions; (2) criticism of plaintiff's work performance; (3) informal reprimands; and (4) alterations in plaintiff's responsibilities or assignments, which taken together were legally insufficient); *Christopher–Ketchum v. Agway Energy Prod.,* 988 F.Supp. 610, 616 (N.D.N.Y. 1997) (holding that a claim of constructive discharge requires a showing of harassment that is more severe and pervasive than that required to show a hostile work environment); *Chisolm v. Kidder, Peabody Asset Management,* 966 F.Supp. 218, 228–29 (S.D.N.Y.1997) (upholding arbitrators' decision that no constructive discharge occurred where employee's responsibilities were diminished by over 20 percent and no bonus was paid which represented 40–50 percent of prior two years gross earnings); *Bauman v. North Am. Graphics, Inc.,* No. 94 Civ. 5975, 1997 WL 278057, at *4 (S.D.N.Y. May 22, 1997) (holding employee resigned and was not constructively discharged because there was no evidence that employer deliberately created working conditions that led to her resignation).

Accordingly, Plaintiff's claim of constructive discharge is denied, with prejudice.

## IX DID PLAINTIFF ESTABLISH A CLAIM UNDER THE NEW YORK STATE HUMAN RIGHTS LAW

Plaintiff raised claims of discrimination pursuant to the New York State Human Rights Law ("NYSHRL"), codified at Section 290 et seq., of the New York State Executive Law. Discrimination claims under the NYSHRL are analyzed in an manner analogous to Title VII, *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.

1996), and therefore, Plaintiff's surviving claim can proceed under state law as well.

## CONCLUSION

Accordingly, for all the aforementioned reasons, Defendant Hewlett Packard's motion for summary judgment is denied in part and granted in part. Plaintiff Kristen L. Victory's case will go forward under a disparate impact cause of action pursuant to Title VII and New York State's Human Rights Law.

Defendant's motion for summary judgment is granted with respect to Plaintiff's claims for failure to promote, pretextual, mixed motive and pattern or practice theories of disparate treatment, the Equal Pay Act, and constructive discharge, and these causes of action are denied with prejudice.

SO ORDERED.