Liz GROSS, Plaintiff,

v.

NATIONAL BROADCASTING COMPANY, INC., Frank Accarino, David Schmerler, Bill McLoughlin, Leslie Harris, Neal Shapiro, Marc Rossenwasser, and Set Etmekjian, Defendants.

No. 00 Civ. 5776(SAS).

United States District Court, S.D. New York.

July 9, 2002.

Scott M. Mishkin, Scott Michael Mishkin, P.C., Islandia, New York, for Plaintiff.

Lawrence R. Sandak, Proskauer Rose LLP, Newark, New Jersey, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Liz Gross has sued her employer, National Broadcasting Company, Inc. ("NBC"), and a number of its employees, claiming sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2 *et seq.*, as amended by the Civil Rights Act of 1991 ("Title VII").[1] NBC now moves to dismiss plaintiff's Complaint under Federal Rule of Civil Procedure 56(c). For the following reasons, defendant's motion is granted.

## I. FACTS

### A. NBC and Its Collective Bargaining Agreement with NABET

NBC is a diversified media company that produces and distributes various

---

1. The parties have stipulated that the following claims are discontinued with prejudice: all claims against the individual defendants; plaintiff's claims for intentional and negligent infliction of emotional distress; plaintiff's breach of contract claim; and all claims of sexual harassment. *See* Affidavit of Lawrence R. Sandak ("Sandak Aff."), attorney for defendants, ¶ 2. Accordingly, plaintiff's remaining claims are limited to discrimination other than harassment and retaliation under federal and New York state law.

forms of entertainment, news and sports programming via broadcast and cable television and other distribution channels. *See* Defendants' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("Def.56.1") ¶ 1. NBC produces a variety of television programming at its Rockefeller Center facility in New York including *Dateline NBC* ("*Dateline*"). *See id.* NBC employs staff employees, temporary personnel and "daily hires," including videotape editors, to work on its programming. *Id.* ¶ 2.

NBC's broadcast engineering employees, including videotape editors, are represented by the National Association of Broadcast Employees and Technicians ("NABET"). *See id.* ¶ 3. NABET is the exclusive bargaining representative for its members and has negotiated and entered into a collective bargaining agreement ("CBA") with NBC which governs the terms and conditions of employment for its members. *See id.* NABET-represented daily hires are employed on a day-to-day basis without any job security. *See id.* ¶ 4. They receive extra pay in lieu of benefits and are compensated based upon a variety of factors, including skill level and labor market demand, subject to a floor established by the CBA. *See id.* The CBA provides minimum wage scales by job classification and expressly gives NBC sole discretion and authority to determine work assignments. *See id.* ¶ 5. Gross has been a NABET member since well before she was hired by NBC. *See id.* ¶ 6. Accordingly, the terms and conditions of Gross's employment are governed by the CBA. *See id.*

**B. Gross's Prior Work Experience**

Between 1980 and 1984, Gross worked for WNEW, a New York television station, as an operations engineer. *See* Deposition of Liz Gross ("Gross Dep."), Ex. A to Sandak Aff., at 62–68. During her tenure at WNEW, a co-worker showed Gross how to use videotape editing equipment. *See id.* at 64. While at WNEW, Gross edited news pieces for the most part. *See id.* at 66.

In 1984, Gross left WNEW for an editing position at the American Broadcasting Company ("ABC"), where she was paid union scale. *See id.* at 70–72. After a two-year hiatus from the broadcast industry, Gross secured summer relief work at NBC in 1996, working part-time as a videotape editor for union scale. *See id.* at 78–85. For six months during 1987, Gross returned to ABC, again on temporary status at union scale. *See id.* at 86–87. Then, for the next seven years, Gross worked as a freelance editor for the Columbia Broadcasting System ("CBS") and was paid union scale. *See id.* at 88–90.

In 1992, Gross secured full-time work as a videotape editor for King World Productions. *See id.* at 102. Gross resigned from King World after approximately eight months to edit a documentary. *See id.* at 104. Then, in 1993, Gross was hired as a full-time freelance editor at Fox Television Network ("FOX") to work on *A Current Affair. See id.* at 112. Gross was paid union scale while at Fox. *See id.* at 114.

**C. Gross's Efforts to Secure a Job at *Dateline***

During 1995, Gross contacted NBC production manager Leslie Harris, offering to work as a summer replacement employee on *Dateline. See id.* at 145–47. Unable to secure such a position, Gross called Harris once a month for six months, asking if there were any openings. *See id.* at 148. Harris repeatedly advised Gross that there were no suitable openings for her at *Dateline. See id.* Every couple of months, Gross would send a copy of her resume to Harris or NBC production manager Wil-

liam McLoughlin. *See* Deposition of William McLoughlin ("McLoughlin Dep."), Ex. E to Sandak Aff., at 72. In early 1996, after McLoughlin interviewed Gross, he recommended that she be interviewed by Betty Corrigan, NBC's Manager of Electronic Journalism. *See id.; see also* Gross Dep. at 141–42. At the time, *Dateline's* "Opens unit" was in need of one additional editor. *See* McLoughlin Dep. at 73. Opens unit editors edit short promotional pieces used at the beginning of each *Dateline* episode but do not edit the same full-length feature pieces as do other *Dateline* editors. *See* Gross Dep. at 152–53. Given the availability of a position in the Opens unit, McLoughlin "decided to give [Gross] a chance." McLoughlin Dep. at 73.

### D. Gross Is Offered *Per Diem* Work at Union Scale as a *Dateline* "Opens" Editor

In March 1996, McLoughlin offered Gross editing work for *Dateline* as a daily hire. *See* Gross Dep. at 133–35. McLoughlin informed Gross that she would be working in the Opens unit for "standard union pay." *Id.* Gross accepted the offer and did not request or attempt to negotiate for a staff position, for a contract, or for a rate of pay above union scale. *See id.* at 133, 189–90. When Gross was hired by NBC, she was not working under a contract for a competing network or news magazine, was not being paid over-scale, had not been recruited by NBC, and was not hired to cut full-length pieces.

Gross's initial compensation level, like that of all unionized NBC editors, was established by the CBA. *See* McLoughlin Dep. at 15. *Dateline* editors were paid union scale when they were hired, without a personal services contract, except those who already held above-scale positions at competing networks. As explained by McLoughlin:

> If there was an editor who was working someplace else, making a higher salary than the NBC rate, we [were] allowed to look into trying to get them a higher amount of money in order for them to come work for NBC.

*Id.* at 16. According to McLoughlin, no editors hired from outside NBC to work exclusively in the Opens unit were offered a contract at hire.[2] *See* Affidavit of William McLoughlin ("McLoughlin Aff.") ¶ 6.

### E. Gross's Training Assignment to the "Day of Air" Unit

Gross began working for NBC in March of 1996. *See* Gross Dep. at 158. Throughout 1996, Gross had three female supervisors—Susan Farkas, Sharon Scott and Leslie Harris. *See id.* at 159. Because Gross had never used Grass Valley editing equipment (the type of equipment used at NBC), she admitted that she "might need some time to get up to speed." *See id.* at 146. Accordingly, Gross was given three days of training on the Grass Valley equipment and then assigned to *Dateline's* Day of Air unit.[3] *See id.* at 152. Gross worked in the Day of Air Unit for about a month. *See id.* at 154. Gross, who understood that she was hired to work in the Opens

---

**2.** *Dateline* editors who were hired without contracts, but who proved their worth by editing full-length pieces, were sometimes rewarded with contracts at later stages of their careers. *See* McLoughlin Dep. at 55.

**3.** The Day of Air unit edits short pieces (typically involving breaking news) that are usually prepared on or near the date they are aired.

*See* Gross Dep. at 152–53. Many *Dateline* editors are assigned to the Day of Air unit at one time or another and it is common for newly-hired editors to work in the unit to gain familiarity with *Dateline's* procedures and equipment. *See* Affidavit of Tessa Capodice ("Capodice Aff."), NBC Unit Manager, ¶ 2.

unit, voiced displeasure to Leslie Harris at being assigned to the Day of Air unit. *See id.*

### F. Gross's Experiences in the Opens Unit

In April 1996, Gross moved to the Opens unit. By this time, Gross had learned that some *Dateline* editors had personal services contracts with NBC at above-union scale rates. *See id.* at 189–90. Shortly thereafter, Gross asked McLoughlin if she could get a personal services contract. *See id.* at 178. McLoughlin denied her request. *See id.*

In November 1996, Gross met with Senior Broadcast Producer Marc Rosenwasser, asked for higher pay, and stated that she wanted to have more of a presence at *Dateline. See id.* at 176. In response, Rosenwasser told Gross to put her concerns in writing. *See id.* On December 16, 1996, Gross wrote to Rosenwasser identifying the following problems: technical development (*i.e.*, her editing room assignment); editorial job assignments (*i.e.*, that as an Opens editor she was not being assigned to edit long format magazine pieces); and equitable compensation (because she was not being paid at a level commensurate with her experience and talent.). *See* Memorandum from Gross to Rosenwasser, dated December 16, 1996, Ex. G to Sandak Aff.

By early 1997, Gross was in conflict with all of her co-workers in the Opens unit who requested that she be removed from the group. Specifically, in April 1997, Leslie Harris met with Larry Morales, Bill Bryant and Ciarin Clark who expressed the following sentiments to Harris:

They came to see me about the lack of professionalism with Liz Gross. They expressed their frustration at her unwill-

ingness to do her fair share of editing, if she had finished editing, that she would never let anyone know and ask for more work, she did not speak to any of them and she alienated herself from the group. They found it extremely difficult to communicate and have a professional relationship with her. They explained it was impossible to have the [O]pens team work effectively with one of the members not talking and even bad mouthing other members. They asked me to remove [Gross] from the Opens group.

Notes from Leslie Harris dated 4/16/97, Ex. A to the Capodice Aff. Gross admitted that she was no longer interested in working in the Opens unit and wanted to edit full-length pieces for *Dateline* (often referred to as "cutting pieces"). *See id.*

In April 1997, Gross asked Neal Shapiro, then NBC executive in charge of *Dateline*, for a personal services contract. Gross describes their conversation as follows:

A. I said to him that I wanted to work towards or get a personal services contract and how could I go about doing that. And he said I would need to cut pieces. That he didn't want to spend any more money on people in the [O]pens unit, and so that if I cut some pieces he would consider me for a personal services contract.

Q. A couple of months later you were given the opportunity to cut pieces; is that right?

A. Yes.

Gross Dep. at 291–92. Indeed, Gross immediately was offered the opportunity to "cut pieces" while in the Opens unit, *see* McLoughlin Dep. at 194, and, by June 1997, she was permitted to "cut pieces" full-time.[4] *See* Gross Dep. at 297.

---

4. As part of her transfer out of the Opens unit, Gross was assigned a new editing room of the

### G. Gross Rejects an Above–Scale Contract

By the Spring of 1998, Gross had been cutting pieces for almost a year and therefore her value to *Dateline* had increased. *See* McLoughlin Dep. at 204. Accordingly, in May of 1998, Gross was offered a one-year contract by NBC with a daily rate of $25.00 above union scale. *See* Gross Dep. at 386–90. The "plus-$25" rate was the standard first step up for NBC editors being offered contracts for the first time. *See* McLoughlin Dep. at 206–07 ("Anybody who was working as a NABET Group–7, the first over-scale payment that they would then be offered would be the plus 25 contract."). "Plus–25" contracts were typically the starting point for a progression of increasing over-scale pay rates. *See id.* at 210 ("Somebody making a plus 25 rate could be given a raise the following year and [make] plus 35 or plus 40.").

But when Gross was offered the standard "plus–25" contract, she rejected it. *See* Gross Dep. at 392. Gross testified:

Q. Did you understand that if you didn't sign the contract, you would not be given the plus 25 daily rate?

A. Yes.

Q. Why did you not sign the contract?

A. Because I did not want to be locked into this agreement.

\* \* \* \* \* \*

Q. Did you understand that by not accepting this, you were foregoing the plus 25 rate and the other benefits offered to you by NBC in this contract?

A. Yes.

*Id.* at 392–93.

### H. Plaintiff's Allegations

Gross alleges that in January 1996, NBC hired three men with less editing experience than her—Seth Kartin, Gary Scheige and Gary Simmons. *See* Complaint ¶ 26. Despite plaintiff's alleged superior work experience, the starting annual base salaries for these men were approximately $23,000 higher than her starting salary. *See id.* ¶ 31. In addition, two other men who were part of NBC's Opens unit at the time, Larry Morales and Bill Bryant, had starting base salaries of approximately $125,000, more than twice plaintiff's starting base salary of $60,000. *See id.* ¶ 41. Furthermore, when Fred Staab was re-hired by NBC in March of 1997, his starting annual base salary was the same as plaintiff's second year salary. *See id.* ¶ 69. Staab was also assigned to more hi–tech edit rooms, regularly received more challenging assignments, and was provided with a better health care package than Gross.[5] *See id.* ¶¶ 70–71.

To remedy the perceived pay differential, Gross approached McLoughlin in August of 1996 and requested the same personal services contract and pay received by Kartin, Scheige and Simmons. *See id.* ¶ 54. McLoughlin denied this request. *See id.* In February of 1997, Gross again

---

sort used by other *Dateline* editors to cut pieces. *See* Gross Dep. at 293. Although the room had "similar equipment" to the room Gross had used in the Opens unit, it was configured differently and, according to Gross, was "not wired for an ease of motion." *See id.* at 294. Gross therefore requested a transfer back to the Opens unit. *See id.* However, Gross had already been replaced in the Opens unit, *see* McLoughlin Dep. at 196,

and there was no longer an available editing room.

5. In addition to the pay disparity, from March 1996 through July 1997, the "self-proclaimed Director of the Opens Unit," Seta Etmekjian, assigned plaintiff a disproportionately heavy workload while lightening the workload of her male counterpart, Morales. *See* Complaint ¶ 56.

asked McLoughlin for the same pay as her male counterparts, Kartin, Scheige and Simmons, but her request was again denied. *See id.* ¶ 75.

In April of 1997, plaintiff met with Neal Shapiro and requested a personal services contract. *See id.* ¶ 79. Shapiro told plaintiff he liked her work and that once she had edited three pieces (story segments), she should contact him about a raise. *See id.* In the meantime, Gross applied for a posted AVID [6] editor position on August 7, 1997. *See id.* ¶ 87. A few months later, NBC hired two men for the position at starting salaries of $130,000 and $95,000. *See id.* After completing three successful pieces,[7] Gross once again approached Shapiro in January 1998 about a personal services contract, *see id.* ¶ 93, and on May 5, 1998, she was presented with a plus-$25 contract. *See id.* ¶ 97. Gross, who complained to Shapiro that the contract's terms were inadequate, also complained to *Dateline* Senior Producer Lisa Hsai that women editors at NBC were being treated unfairly. *See id.* ¶¶ 99, 100. Shapiro then told Gross not to sign the contract pending NBC's internal investigation into her allegations of · sex discrimination. *See id.* ¶ 102. One year later,[8] in June of 1999, Shapiro allegedly retaliated against Gross by accusing her of changing editorial content and threatening to fire her. *See id.*

¶ 115. In that same month, Shapiro also informed Gross that he was "taking back" the proposed contract that Gross had earlier rejected. *See id.* ¶ 116.

## I. Proof of Plaintiff's Allegations

Gross testified that she has issues with the salaries of twenty-one male editors and six female editors. *See* Gross Dep. at 576, 580–81. Of the twenty-one men, Gross believes she should be making more than eight of them and the same amount as the remainder. *See id.* at 577–78. Of the six women, Gross believes that she should be making more than four of them and the same amount as Dana Tamaura and Ina Smith. *See id.* at 580–81. Gross conceded, however, that not all women at NBC are discriminated against, again citing Tamaura and Smith. *See id.* at 227.

Gross also conceded that she does not have sufficient information concerning the backgrounds and experiences of Kartin, Scheige and Simmons—the three male editors she has identified as comparators—to make an appropriate comparison with herself. *See id.* at 198–02. For example, Gross testified as follows with regard to Scheige, who she alleges has less editing experience:

Q. As you sit here now, do you believe that you have enough information

---

6. AVID is a non-linear computerized editing system considered the most advanced editing technology at the time. *See* Complaint ¶ 87.

7. Plaintiff used advanced technology in the Digital Picture Manipulator ("DPM") room to edit her first piece for Shapiro. *See* Complaint ¶ 82. Subsequent to the completion of her first piece, Harris told Gross she could no longer use the equipment in the DPM room to cut her pieces and plaintiff was removed from the DPM room. *See id.* ¶ 83. Staab was assigned to a newly available DPM room in July 1997. *See id.* ¶ 85.

8. Gross alleges other incidents of discrimination in the intervening months. For example,

in April 1999, Gross requested that she be assigned to work as an AVID editor on an upcoming Geraldo Rivera show. *See* Complaint ¶ 107. This request was refused by Tessa Capodice, Harris's replacement as *Dateline's* unit manager, on the ground that NBC did not have an extra AVID for Gross to use. *See id.* Approximately two weeks later, NBC opened an AVID room for a senior male editor who was provided months of AVID training. *See id.* ¶ 108. In addition, from May 1998 through July 1999, NBC refused to give Gross any "crash" assignments. *Id.* ¶ 111.

about Mr. Scheigi's [sic] credentials to be able to make an appropriate comparison between yours and his?

A. Most likely not.

*Id.* at 200.

When asked to identify those persons at NBC who have discriminated against her because of her sex, Gross listed five women and four men. *See id.* at 316. Of the four men Gross identified, she admitted that two, Frank Accarino and David Schmerler, did nothing more than support NBC's discriminatory wage policies. *See id.* at 225–26. As to the remaining two men, Gross conceded that McLoughlin was responsible for hiring her and recommending her for a pay raise, *see id.* at 133, 339, and that Rosenwasser gave her the type of assignments she liked. *See id.* at 307.

## II. DISCUSSION

### A. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is 'material' for these purposes if it might affect the outcome of the suit under the governing law [while] an issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Shade v. Housing Auth. of City of New Haven*, 251 F.3d 307, 314 (2d Cir.2001) (internal quotation marks and citations omitted).

In assessing the record to determine whether genuine issues of material fact are in dispute, a court must view the evidence "in the light most favorable" to the non-movant. *See Breland–Starling v. Disney Publishing Worldwide*, 166 F.Supp.2d 826, 829 (S.D.N.Y.2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Parkinson v. Cozzolino*, 238 F.3d 145, 150 (2d Cir.2001). "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the nonmovant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000) (quoting *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505).

The non-moving party may not, however, "rest upon ... mere allegations or denials." *St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir.2000). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir.1999); *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998) ("If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted.") (quotation marks, citations, and alterations omitted). Mere conclusory statements, conjecture or speculation cannot by themselves create a genuine issue of material fact. *See Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996). This applies no less to discrimination cases than to other areas of litigation. *See Ashton v. Pall Corp.*, 32 F.Supp.2d 82, 87 (E.D.N.Y.1999). Courts within "the Second Circuit have not hesitated to grant defendants summary judgment in such cases where ... plaintiff has offered little or no evidence of discrimination." *Scaria v. Rubin*, No. 94 Civ. 3333, 1996 WL 389250, at *5 (S.D.N.Y. July 11,

1996), *aff'd*, 117 F.3d 652 (2d Cir.1997). Indeed, it is now "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

## B. The Continuing Violation Doctrine

■ Courts have previously recognized a narrow exception to the Title VII limitations period when an otherwise time-barred claim is part of a "continuing violation." *See Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir.1993). The doctrine has been generally limited to situations where a specific discriminatory policy or mechanism has been alleged. *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir.1996). Accordingly, " 'multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation.' " *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir.1998) (quoting *Lambert*, 10 F.3d at 53).

The filing period for discrete acts of discrimination was recently addressed in *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). In *Morgan*, the Supreme Court held that Title VII "precludes recovery for discrete acts of discrimination that occur outside the statutory time period." *Id.*, 122 S.Ct. at 2068. As explained by the Supreme Court:

discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180–or 300–day

time period after the discrete discriminatory act occurred.

*Id.*, 122 S.Ct. at 2072. The Court elaborated as follows:

Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment action constitutes a separate actionable "unlawful employment practice." Morgan can only file a charge to cover discrete acts that "occurred" within the appropriate time period. . . . All prior discrete discriminatory acts are untimely filed and no longer actionable.

*Id.*, 122 S.Ct. at 2073. The Court did not address "pattern or practice" claims which presumably can still form the basis of a continuing violation. *See id.* n. 9. The Court did make clear, however, that there is no indication that the term "practice" as used in Title VII "converts related discrete acts into a single unlawful practice for the purposes of timely filing." *Id.*, 122 S.Ct. at 2071.

The holding in *Morgan* is in accord with Second Circuit law which states that alleged failures to compensate adequately, transfers, job assignments and promotions cannot form the basis for a continuing violation claim. *See, e.g., Pollis v. New Sch. For Social Research*, 132 F.3d 115, 119 (2d Cir.1997) (holding that a claim of discriminatory pay involves a series of discrete, individual wrongs rather than a single and indivisible course of wrongful action); *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir.1997) ("[A] job transfer, or discontinuance of a particular job assignment, are not acts of a 'continuing' nature." (internal quotation marks and citation omitted)); *Crosland v. City of New York*, 140 F.Supp.2d 300, 308 (S.D.N.Y. 2001) ("It is well-settled that transfers, demotions, failure to compensate ade-

quately, and failure to promote are all discrete acts which do not constitute a continuing violation.").

■ Gross offers no evidence that NBC maintained and/or applied any type of discriminatory policy or practice. Rather, Gross alleges discrete, unrelated claims of discriminatory treatment by different managers which cannot form the basis of a continuing violation. *See Quinn,* 159 F.3d at 766 (holding that gaps of one or more years between alleged incidents breaks the asserted continuum of discrimination and precludes finding of continuing violation); *Crosland,* 140 F.Supp.2d at 307 (holding that actions by different supervisors in different departments militate against finding of continuing violation). Because the continuing violation doctrine is inapplicable here, Gross is subject to the following limitations periods.

### 1. Gross's Title VII Claims Arising More Than 300 Days Before the Filing of Her Administrative Charge Are Time–Barred

■ In New York, Title VII claims must be filed with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the alleged discriminatory act. *See* 42 U.S.C. § 2000e–5(e)(1); *see also Butts v. City of New York Dep't of Hous. Preservation & Dev.,* 990 F.2d 1397, 1400 (2d Cir.1993). The law is clear: "[w]hen a plaintiff fails to file a timely charge with the EEOC, the claim is time-barred." *Butts,* 990 F.2d at 1401; *Lambert,* 10 F.3d at 53.

■ Here, Gross filed her initial administrative complaint ("Charge") with the New York State Division of Human Rights and the EEOC on July 1, 1999. *See* Complaint ¶ 11: *see also* Charge of Discrimination, Ex. H to Sandak Aff. Accordingly, all federal claims arising before September 1, 1998 (*i.e.,* 300 days before Gross filed her

Charge) are time-barred and must be dismissed, including claims relating to: Gross's initial compensation; Gross's assignment to the Day of Air unit in March 1996; NBC's denial of her request for a personal services contract in April 1996; and any claim of inequitable compensation prior to September 1, 1998.

### 2. Gross's NYSHRL Claims Arising More Than Three Years Before She Filed Her Complaint Are Time–Barred

■ Claims under the New York State Human Rights Law ("NYSHRL") must be filed in court within three years of the alleged discriminatory act. *See Lightfoot,* 110 F.3d at 906. Claims arising outside the three-year period are time-barred and must be dismissed. *See id.* Gross filed her Complaint on August 3, 2000. Accordingly, all New York state claims arising before August 3, 1997 (*i.e.,* three years before Gross filed her Complaint) are time-barred, including claims relating to: Gross's initial compensation; Gross's assignment to the Day of Air unit in March 1996; NBC's denial of her request for a personal services contract in April 1996; and any claim of inequitable compensation prior to August 3, 1997.

### C. Gross's Remaining Claims Are Not Supported by Evidence of Gender–Based Disparities

■ Gross's few timely discrimination claims are insufficient as a matter of law to establish liability under Title VII or the NYSHRL. In an action under either statute, the plaintiff bears the ultimate burden of proving intentional discrimination by a preponderance of the evidence. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248,

253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To satisfy this burden, plaintiff must prove that the alleged impermissible consideration was a determinative factor in the adverse employment action about which she complains. *See Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).

■ Where, as here, a plaintiff has not alleged any direct evidence of discrimination, she must proceed under the three-step burden-shifting analysis first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and clarified in *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) and *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097. *See also Tappe v. Alliance Capital Mgmt. L.P.,* 198 F.Supp.2d 368, 372 (S.D.N.Y.2001). Under that analysis, a plaintiff must establish a *prima facie* case of discrimination by a preponderance of the evidence. If the plaintiff does so, the burden of production shifts to the defendant to proffer a legitimate, non-discriminatory reason for its actions. *See Burdine,* 450 U.S. at 254, 101 S.Ct. 1089. Once the defendant articulates a neutral reason, the plaintiff must prove by a preponderance of the evidence that the employer's legitimate non-discriminatory reasons were not its true reasons, but were a pretext for discrimination. *See Reeves,* 530 U.S. at 146–47, 120 S.Ct. 2097.

### 1. Gross Cannot Establish a *Prima Facie* Case of Discrimination

■ To establish a *prima facie* case of gender-based pay discrimination, a plaintiff must demonstrate: (1) that she is a member of a protected class; (2) that she was paid less than similarly situated men; and (3) evidence of discriminatory animus. *See Belfi v. Prendergast,* 191 F.3d 129, 139 (2d Cir.1999); *Cruse v. G & J USA Publ'g,* 96 F.Supp.2d 320, 326 (S.D.N.Y.2000).

■ To be "similarly situated" for purposes of establishing a *prima facie* case, the individuals with whom plaintiff attempts to compare herself must be similarly situated in "all material respects," including holding the same position, reporting to the same supervisor, and being subject to the same workplace standards. *Shumway v. UPS, Inc.,* 118 F.3d 60, 64 (2d Cir.1997); *Ramos v. Marriott Int'l, Inc.,* 134 F.Supp.2d 328, 339 (S.D.N.Y. 2001). A pay discrimination claim must be dismissed if the plaintiff cannot identify any such similarly situated individuals. *Cf. Victory v. Hewlett–Packard Co.,* 34 F.Supp.2d 809, 825 (S.D.N.Y.1999) (holding that plaintiff failed to establish a violation of the Equal Pay Act where she could name no male sales representatives in her area who had similar experience and length of service but were paid higher wages).

■ Similarly, in order to establish a *prima facie* case of gender discrimination with respect to other terms and conditions of employment, a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination. *See Campbell v. Alliance Nat'l Inc.,* 107 F.Supp.2d 234, 243 (S.D.N.Y.2000). While there is no dispute that Gross is a member of a protected class and that she possesses the basic skills necessary for the performance of her job (*i.e.,* she is "qualified"), she has failed to establish the remaining elements of a *prima facie* case of discrimination.

### a. Gross's Initial Pay Disparity Claims

█ Even if plaintiff's claims that she was not offered a personal services contract and that she was paid less at the time she was hired were not time-barred, Gross cannot prove that her initial compensation was lower than the pay of comparable male editors. Gross's compensation, as well as the compensation of all other editors who were hired from outside NBC to work full-time in the Opens unit, was established by union contract. Because Gross's initial compensation was at the same level as all other Opens unit editors, both male and female, she cannot establish a *prima facie* case of pay discrimination.

In an effort to offer some evidence of pay disparity, Gross compares herself to male editors who, unlike herself, were hired away from competing networks and news magazines (*i.e.*, Kartin, Scheige and Simmons). Her attempted comparison, which is unsupported by admissible evidence, is inappropriate for several reasons. *First,* these men were not hired to work in the Opens unit. *Second,* as with all other employees who were not recruited from a competing network, Gross was not eligible for an above-scale arrangement. Thus, she is not similarly situated to the individuals to whom she compares herself for purposes of establishing a *prima facie* case.[9] *See Shumway,* 118 F.3d at 64. Accordingly, Gross's initial pay disparity claims are dismissed.

### b. Gross's Claims of Post–1997 Pay Discrimination

█ Gross's pay claims under state law are time-barred until August 1997, and her claims under federal law are time-barred until September 1998. In June 1997, Gross was allowed to start cutting pieces full-time. In May of 1998, less than one year after she started cutting pieces full-time, Gross was offered a "plus-$25" contract. The "plus-$25" rate was standard for first-time above-scale contracts and was the typical starting point for a series of escalating raises. Gross rejected the contract, however, because she did not want "to be locked into" it.[10] Gross Dep. at 392.

Gross cannot argue that NBC acted adversely with respect to her compensation when it was she who rejected a raise when it was offered. *See Karpel v. Inova Health Sys. Servs.,* 134 F.3d 1222, 1229 (4th Cir.1998) (holding that plaintiff could not establish on the part of her employer who offered to transfer employee out of a smoking unit into a non-smoking unit but plaintiff refused); *Armstrong v. Chicago Park Dist.,* 693 F.Supp. 675, 680–82 (N.D.Ill.1988), *aff'd,* 886 F.2d 332 (7th Cir. 1989) (emphasizing that employee turned down offered promotions when granting employer's motion for summary judgment on employee's failure to promote claim); *Prado v. L. Luria & Son, Inc.,* 975 F.Supp. 1349, 1356 (S.D.Fla.1997) (granting employer's motion for summary judgment with respect to employee's Title VII

---

**9.** In order to lure talented editors away from other networks, NBC is prepared to pay market rate and match (or exceed) the editor's then-existing compensation arrangement. Thus, any salary differential between Gross and those editors who were recruited by *Dateline* through salary matching does not create a triable issue of fact. *See Shieldkret v. Park Place Entm't Corp.,* No. 01 Civ. 5471, 2002 WL 91621, at *3 (S.D.N.Y. Jan.23, 2002) ("[S]alary matching—payment of a higher salary to equal or exceed that of a prior job, or a competing offer—is a reasonable business tactic to lure or retain employees and justify a wage differential.").

**10.** Gross did receive annual pay increases under the CBA. *See* Gross Dep. at 393.

claim because, *inter alia,* plaintiff refused a promotion she had been offered).

Gross cannot turn down a salary increase and then claim in litigation that she has not been compensated at the same level as male employees. To hold otherwise would permit Gross to defeat the primary goal of Title VII, which is to "end discrimination ... not [encourage] lawsuits." *See Ford Motor Co. v. EEOC,* 458 U.S. 219, 230, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982). Gross's post–1997 pay disparity claims are therefore dismissed.[11]

### c. Gross's Claims Relating to Terms and Conditions Other Than Pay

 To establish a *prima facie* case of disparate treatment, Gross must show that she was subjected to conduct that rises to the level of a "materially adverse change" in the terms and conditions of her employment. *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *see also Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000). The change in the terms and conditions of employment "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya,* 202 F.3d at 640. Gross's disparate treatment claim fails because she was not subjected to any adverse employment action by NBC. Being refused access to the equipment of her choice on demand may have inconvenienced Gross, but it does not rise to the level of an adverse employment action. *See Jacob–Mua v. Veneman,* 289 F.3d 517, 522 (8th Cir.2002) (holding that employer's actions of giving employee work assignments not commensurate with her skills, giving her inferior equipment, denying her attendance at a writing workshop, and denying her a timely promotion did not constitute adverse employment actions under Title VII).

### d. No Evidence of Circumstances Giving Rise to an Inference of Discrimination

 Assuming, *arguendo,* that Gross could establish discriminatory pay disparity or an adverse employment action, she has produced no evidence of circumstances giving rise to an inference of discrimination. The record is replete with Gross's conclusory statements and subjective feelings—not facts—in support of her claims that she was treated differently because of her gender. Such beliefs cannot withstand a properly supported motion for summary judgment. *See Bickerstaff,* 196 F.3d at 452 (holding that statements devoid of specifics, but replete with conclusions, are insufficient to defeat summary judgment).

### 2. NBC Has Articulated Non–Discriminatory Reasons for All of Its Actions and Gross Cannot Establish That Those Reasons Are Pretextual

 Even if I were to find that Gross has established a *prima facie* case of discrimination, Gross cannot refute NBC's legitimate, non-discriminatory reasons for its actions in hiring Gross at her initial starting salary and offering her a plus-$25 contract. These decision were based on legitimate and non-discriminatory criteria and Gross has proffered nothing to prove that NBC's reasons were a pretext for discrimination.

Gross does not contend, nor can she, that she was working for a competing network at a higher-than-scale salary at the

---

11. Gross's post–1997 pay disparity claim can be alternatively dismissed because she cannot identify a single male employee who is "simi-larly situated" to her for salary purposes. *See Victory,* 34 F.Supp.2d at 824–25.

time she was hired by NBC. In addition, NBC has offered evidence that some of the producers with whom Gross worked complained about her performance and demeanor. *See* Ex. B to Capodice Aff. These criticisms provide a further, legitimate business reason why Gross was not viewed as a "preeminent" editor deserving of an inordinately high salary. *See McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997) (holding that plaintiff's rationalizations for his deficiencies did not serve to create a triable issue); *Taylor v. Records*, No. 94 Civ. 7689, 1999 WL 124456, at *10 (S.D.N.Y. Mar.8, 1999) ("[F]aulting others for, or otherwise rationalizing, problems legitimately perceived by her employer does not establish pretext.").

In a similar vein, Gross concedes that the gender bias she perceives at NBC did not adversely affect the compensation of *all* women videotape editors at NBC. *See* Gross Dep. at 227, 580. This admission further demonstrates that the compensation of *Dateline* editors is based on legitimate, non-discriminatory factors and not gender-based discrimination. *See Magnan v. Manhattan Eye, Ear & Throat Hosp.*, No. 01 Civ. 6306, 2002 WL 334505, at *4 (S.D.N.Y. Feb.28, 2002) ("The fact that [the employer] provided other members of plaintiff's protected class with a severance package negates any inference of discriminatory conduct that one might infer from [the employer's] failure to provide plaintiff with severance.").

### D. Gross's Retaliation Claim Must Be Dismissed

For the most part, Gross's Complaint is entirely vague concerning any claim of retaliation, identifying neither her protected activities, nor NBC's alleged retaliatory actions. However, Gross does allege, specifically, that after she complained to NBC about alleged gender discrimination in

May 1998, Shapiro retaliated against her in June 1999 by threatening to fire her and "taking back" the May 1998 contract previously rejected by Gross. Complaint ¶¶ 100–02, 115–16. This retaliation claim must be dismissed for a number of reasons.

### 1. Gross Did Not Assert a Retaliation Claim in Her EEOC Charge

Gross's retaliation claim must be dismissed because it was not raised in her July 1, 1999 Charge. District courts have jurisdiction to hear Title VII claims that either are included in an EEOC charge, or are based on conduct subsequent to the EEOC charge which is "reasonably related" to the conduct alleged in the charge. *See Butts*, 990 F.2d at 1401; *see also Stewart v. United States Immigration and Naturalization Serv.*, 762 F.2d 193, 198 (2d Cir.1985). This exhaustion requirement is an essential element of Title VII's statutory scheme. *See Butts*, 990 F.2d at 1401. Here, the alleged retaliation took place in June 1999, before Gross filed her Charge in July 1999. Therefore, Gross's failure to include a retaliation claim in her Charge precludes her from asserting it in this case.

### 2. Gross Cannot Establish a *Prima Facie* Case of Retaliation

Even if this Court has jurisdiction to hear the merits of Gross's retaliation claim, this claim is fatally deficient. In order to make out a *prima facie* case of retaliation, a plaintiff must prove that: (1) she engaged in protected activity; (2) the defendant was aware of the protected activity; (3) she was subjected to an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action. *See Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir.1996).

Significantly, the fourth element of the *prima facie* case cannot be established where the adverse employment action is too remote in time from the alleged protected activity.[12]

■ Assuming, *arguendo*, that Gross can satisfy the first three elements of her *prima facie* case, her retaliation claim fails because she cannot satisfy the fourth element.[13] This is so because Gross cannot establish a causal connection between her alleged protected activity in May 1998 and Shapiro's alleged retaliatory conduct in June 1999. The intervening 13–month period between Gross's protected activity and the alleged retaliation is too temporally remote to support a retaliation claim. Accordingly, Gross's retaliation claim is dismissed.

## III. CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted and this case is dismissed. The Clerk of the Court is directed to close this case.

12. *See, e.g., Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citing with approval cases dismissing retaliation claims where there were three and four month periods between protected activity and adverse employment action, noting the temporal proximity must be "very close"); *Cooper v. Morgenthau,* No. 99 Civ. 11946, 2001 WL 868003, at *8 (S.D.N.Y. July 31, 2001) (dismissing retaliation claim where adverse action occurred seven months after protected activity); *Cobian v. New York City,* No. 99 Civ. 10533, 2000 WL 1782744, at * 16 (S.D.N.Y. Dec.6, 2000) (dismissing retaliation claim where there was four month lapse between protected activity and adverse action), *aff'd by summary order,* No. 01–7575, 2002 WL 4584 (2d Cir. Dec. 21, 2002); *Cruse,* 96 F.Supp.2d at 327 (dismissing retaliation claim where there was more than six month lapse between protected activity and adverse employment action).

13. This assumes that Shapiro's threat to fire Gross can be considered an adverse employment action given that Gross already rejected the contract that Shapiro threatened to take back.